Landon Newell (UT #14738)
Hanna Larsen (UT #18458)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
Tele: (801) 486-3161
landon@suwa.org
hanna@suwa.org

*Attorneys for Plaintiffs Nine Mile Canyon Coalition and Southern Utah Wilderness Alliance*

Edward B. Zukoski (*pro hac vice pending*)
Wendy Park (*pro hac vice pending*)
CENTER FOR BIOLOGICAL DIVERSITY
1536 Wynkoop Street, Suite 421
Denver, CO 80202
(303) 641-3149
tzukoski@biologicaldiversity.org
wpark@@biologicaldiversity.org

Oliver Wood (UT # 17474)
OLIVER WOOD LAW, PLLC
P.O. Box 581312
Salt Lake City, UT 84158
(206) 351-5320
ofinnwood@gmail.com

*Attorneys for Plaintiff Center for Biological Diversity*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| **NINE MILE CANYON COALITION, SOUTHERN UTAH WILDERNESS ALLIANCE**, and **CENTER FOR BIOLOGICAL DIVERSITY**,<br><br>Plaintiffs,<br><br>v.<br><br>**GERALD KENCZKA**, in his official capacity as Assistant Field Manager for Lands and Minerals, Vernal Field Office, Bureau of Land Management, **UNITED STATES BUREAU OF LAND MANAGEMENT**, and **UNITED STATES DEPARTMENT OF THE INTERIOR**,<br><br>Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Case No. 2:26-cv-00932<br><br>Judge _____ |

**INTRODUCTION**

1. This lawsuit challenges Federal Defendants' decision to allow Duchesne County to blow up and destroy cliff walls and rock formations to accommodate the widening, paving, and significant realignment of the Gate Canyon Road through Gate Canyon in eastern Utah (the "Gate Canyon Project"), in violation of multiple laws adopted to protect the environment and cultural resources. The road construction will facilitate increased traffic through Gate Canyon and the adjoining Nine Mile Canyon, threatening some of the state's most important cultural and scenic values in the larger Nine Mile Canyon region.

2. Gate Canyon is a scenic canyon that feeds into Nine Mile Canyon—Utah's world-renowned, cultural and archaeological crown jewel. Nine Mile Canyon is often referred to as "the world's longest art gallery." Bureau of Land Mgmt., 9 Mile Canyon | Utah, https://www.blm.gov/visit/nine-mile-canyon (last visited Oct. 5, 2026). Gate Canyon is home to "a significant and high density of historic, cultural, and archeological sites joined together in several overlapping historic landscapes, including Nine Mile Canyon and its tributaries, from the stream bed to the top of the plateau." Bureau of Land Mgmt., Price Field Office, *Proposed Resource Management Plan and Final Environmental Impact Statement*, 3-91 (Aug. 2008) (last visited Oct. 5, 2026) ("Price FEIS").



*Photo 1: the Owl Panel in Nine Mile Canyon*




*Photo 2: historic axle grease inscriptions in Gate Canyon adjacent to Wells Draw Road*

3. The <u>entire</u> extent of Nine Mile Canyon (which extends for over 40 miles) "is eligible for the [National Register of Historic Places]" and "many of the characteristics are historically significant at the national level." Price FEIS at 3-91. The canyon "is known to contain the country's highest concentration of rock art panels, remnants of the prehistoric Archaic, Fremont, and Ute cultures . . . The rock structural remains of Fremont homes, granaries, and 'forts' are more visible in Nine Mile Canyon than almost anywhere in the Fremont cultural area." *Id.*, App. L – ACEC Evaluations for the Price Resource Management Plan, at L-14.

4. The Nine Mile Canyon region, including Gate Canyon, is home to a variety of wildlife habitat including "mule deer, elk, black bear, mountain lion, Rocky Mountain bighorn sheep, fox, yellow-bellied marmot, beaver, side-blotched lizard, wild turkey, and raptors including the golden eagle, prairie falcon, red-tailed hawk, American kestrel, and Cooper's hawk." *Id.* at L-15. "The abundance and variety of wildlife contribute to the visual and landscape values and demonstrate the ecological importance of the canyon." *Id.*

5. For its part, Gate Canyon similarly contains many cultural and historic wonders. This includes, at a minimum, "47 historic sites" located along or near the existing Gate Canyon Road, "43 of which are considered eligible to the National Register of Historic Places[.]" Bureau of Land Mgmt., Gate Canyon Road Improvement Project UTU-81573, DOI-BLM-UT-G010-2013-0018-EA, at 9 (Nov. 2015) ("2015 EA"). It is also home to a broad range of wildlife and plant species including threatened, endangered, and sensitive status species. *See id.* at 10.

6. Together Nine Mile and Gate Canyons make up the 78-mile Nine Mile Canyon National Backcountry Byway, which was designated by the Bureau of Land Management ("BLM") in 1990. Backcountry byways are part of the National Scenic Byway system and are designated "corridors along back country roads which have high scenic, historic, archaeologic, or other public interest values." Bureau of Land Mgmt., *Handbook H-8357-1 Byways*, I-1 (1993) (last visited Oct. 5, 2026).

7. BLM rushed its April 2026 decision to approve the blasting and paving of Gate Canyon and hid that process from the public. Among other actions, the agency (1) rejected requests by the public to participate in and comment on the proposed action and issued its decision without first having provided any information about the project for public review; (2) failed to analyze and disclose the foreseeable impacts of road construction and increased traffic to a broad range of resource values including cultural, historic, scenic, and wildlife, and failed to consider reasonable alternatives to the proposed action; (3) made a decision that is not in accordance with the applicable land use plans; (4) failed to comply with necessary cultural and archaeological preservation procedures and obligations; and (5) did not consult with the United

States Fish and Wildlife Service ("FWS") regarding the foreseeable impacts to threatened and endangered species.

8. Federal Defendants' failures and omissions discussed herein are violations of the National Environmental Policy Act ("NEPA"), the Federal Land Policy and Management Act ("FLPMA"), the National Historic Preservation Act ("NHPA"), the Endangered Species Act ("ESA"), the Administrative Procedure Act ("APA"), and the regulations and policies that implement these laws.

9. Accordingly, Plaintiffs ask this Court to hold unlawful and set aside Defendants' approval of the Gate Canyon Project.

## JURISDICTION AND VENUE

10. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief); the APA, 5 U.S.C. §§ 701-706; and the ESA, 16 U.S.C. § 1540(g).

11. The Court may grant the relief requested under the ESA, 16 U.S.C. § 1540(g); the APA, 5 U.S.C. § 706(2); and 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief).

12. Venue in the District of Utah is appropriate under 28 U.S.C. § 1391(e) because it is where a substantial part of the events or omissions giving rise to the claims occurred and the federal public lands at issued are in this district.

13. Plaintiffs have standing under Article III of the U.S. Constitution because the challenged actions harm their members, which will be remedied by a favorable ruling from this Court. Plaintiffs' members and staff visit, recreate, view, and enjoy the public lands in and around the Gate Canyon Project, appreciate the untrammeled, scenic nature of the area, seek out

and appreciate wildlife, including the Mexican spotted owl (the "Owl"), and plan to return to the area and surrounding region often and within the next year. The road improvements approved by BLM will degrade the recreational, cultural, biological, and other values that Plaintiffs' members and staff enjoy and appreciate in and around the Project area (*i.e.*, the Nine Mile Canyon region).

14. The challenged action is final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, 706.

15. Plaintiffs Southern Utah Wilderness Alliance ("SUWA") and the Center for Biological Diversity ("the Center") provided sixty days' notice of intent to file suit pursuant to the ESA's citizen suit provision, 16 U.S.C. § 1540(g), by letters to BLM and FWS dated April 30, 2026 and June 15, 2026, respectively. None of the Defendants responded to the notices provided.

16. Plaintiffs have exhausted all required administrative remedies.

**PARTIES**

17. Plaintiff NINE MILE CANYON COALITION (the "Coalition") is a nonprofit corporation formed in the early 1990's to protect, preserve, and educate the public concerning the past and present cultures within the natural landscape of Nine Mile Canyon and its tributary canyons, including Gate Canyon. The Coalition has members throughout the State of Utah and the United States. The Coalition's members use and enjoy Nine Mile Canyon and its tributary canyons, including Gate Canyon, for a variety of purposes including camping, hiking, photography, and perhaps most importantly, for studying and learning about the archaic, Fremont, Ute, and other peoples who, for thousands of years, called Nine Mile Canyon and its tributary canyons home.

18. Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE is a nonprofit environmental membership organization dedicated to the preservation of outstanding wilderness found throughout Utah, and the management of wilderness-quality lands in their natural state for the benefit of all Americans. SUWA has offices in Salt Lake City and Moab, Utah, and Washington D.C. SUWA has approximately 12,500 members across the nation, including thousands of members in Utah. SUWA's members use and enjoy federal public lands in the Nine Mile Canyon region (including Gate Canyon) for a variety of purposes, including camping, hiking and other recreational activities, solitude, viewing native flora and fauna, cultural and historic appreciation, and photography. SUWA promotes national recognition of the Nine Mile Canyon region's unique characteristics through research and public education. SUWA also supports administrative and legislative initiatives to permanently protect the federal public lands in Utah's wildest places. SUWA brings this action on its own behalf and on behalf of its members.

19. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a national nonprofit organization dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center has over 120,000 members and is headquartered in Tucson, Arizona. The Center has a long history of environmental advocacy, public lands conservation, and working to protect species and habitats that occur in Utah, including within the Nine Mile Canyon region. The Center's members visit the Nine Mile Canyon region for hiking, camping, viewing and studying wildlife, photography, and other recreational activities. The Center's members derive recreational, spiritual, scientific, educational, and aesthetic benefit from

their activities in these areas. The Center brings this action on its own behalf and on behalf of its members.

20. Plaintiffs' members, including Mr. Ray Bloxham, Mr. Chad Hamblin, and Ms. Pam Miller, use and enjoy the Nine Mile Canyon region, including Gate Canyon and lands at issue in this litigation, for a variety of purposes including camping; hiking; viewing wildlife; landscape and wildlife photography; and viewing the centuries-old petroglyphs, inscriptions, and other cultural and historical markers. The areas that Mr. Bloxham, Mr. Hamblin, Ms. Miller, and other of Plaintiffs' members use include modeled suitable habitat and habitat deemed "good to fair" for the Owl, and where this imperiled species may be present. Mr. Bloxham's, Mr. Hamblin's, Ms. Miller's and other of Plaintiffs' members' use and enjoyment of the Nine Mile Canyon region, including Gate Canyon, is enhanced by Gate Canyon's towering canyon walls, high concentration of remarkably well-preserved cultural and historical artifacts, and by knowing that the Owl may be present in the area.

21. Mr. Bloxham has visited the Nine Mile Canyon region and driven the Wells Draw Road where canyon walls would be blasted and the road paved many times in the past thirty years, and most recently in October 2026. Mr. Bloxham visits the area at least once or twice a year and has plans to continue to do so in the future, including in the fall of 2027.

22. Mr. Chad Hamblin is a member of the Center who has visited the Nine Mile Canyon region since childhood as a Boy Scout, Scoutmaster, and hiker. He recently moved from Roosevelt, Utah to Moab, Utah and drives back and forth between Moab and Roosevelt to visit his property, family, and friends. He plans to continue hiking and cross-country ski in the areas in

and around Gate Canyon on his trips between Moab and Roosevelt, which occur several times per year.

23. Ms. Miller is an Associate Professor Emeritus of Anthropology & Museum Studies at Utah State University Eastern in Price, Utah and helped found the Coalition. She served on the Coalition's Board for 30 years and continues to be a Coalition member. Ms. Miller visits Nine Mile Canyon and its tributary canyons, including Gate Canyon where the canyon walls would be blasted and the road paved, several times each year, and most recently in September 2026. She has plans to continue to do so in the future, including in the next few months.

24. The aesthetic, recreational, inspirational, spiritual, scientific, and educational interests of these and other Plaintiff groups' members have been and will continue to be adversely affected and irreparably injured if Defendants' violations of law continue. These are actual, ongoing, concrete injuries caused by Defendants' violations of NEPA, the ESA, NHPA, and FLPMA. The relief sought will redress these injuries.

25. Defendant GERALD KENCZKA is sued in his official capacity as Assistant Field Manager for Lands and Minerals of BLM's Vernal Field Office. Mr. Kenzcka signed the Decision Record approving the Gate Canyon Project.

26. Defendant UNITED STATES DEPARTMENT OF THE INTERIOR ("Interior Department") is responsible for overseeing the management of approximately five hundred million acres of federal public lands across the United States, including those managed by BLM in Utah, for a variety of competing resources, including the protection of the natural and human environment.

27. Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is an agency in the Interior Department. BLM is responsible for managing publicly owned lands and minerals, in accordance with federal law. BLM is the agency that manages the public lands in Utah at issue in this case.

28. Mr. Kenzcka, BLM, and the Interior Department are collectively referred to as "Defendants" or "Federal Defendants."

## LEGAL FRAMEWORK

### I. Administrative Procedure Act

29. The APA provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." *Id.*

30. Pursuant to the APA, a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be[] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or] without observance of procedure required by law." *Id.* § 706(2)(A), (C), (D).

31. When making a decision, a federal agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted); *see also Big Horn Coal Co. v. Temple*, 493 F.2d 1165, 1169 (10th Cir. 1986) ("[a]gencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departures"); *Midwestern*

*Transp., Inc. v. Interstate Commerce Comm'n*, 635 F.2d 771, 777 (10th Cir. 1980) ("the court must require the agency to adhere to its own pronouncements or explain its departure from them"). Under the arbitrary and capricious standard, the court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (citation omitted).

32. An agency decision is arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.*

## II. National Environmental Policy Act

33. Congress enacted NEPA "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

34. NEPA "declares that it is the continuing policy of the Federal Government . . . to use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony." 42 U.S.C. § 4331(a).

35. NEPA aims to help public officials make decisions that are based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

Federal agencies must comply with NEPA before there are "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(v).

36. To accomplish these purposes, NEPA requires that all federal agencies prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Known as an environmental impact statement ("EIS") this statement must, among other things, rigorously explore and objectively evaluate all reasonable alternatives, analyze all foreseeable adverse environmental effects, including a discussion of the means to mitigate adverse environmental impacts. 42 U.S.C. § 4332(2)(C).

37. An agency may also prepare an environmental assessment ("EA") to determine whether an EIS is necessary. 42 U.S.C. § 4336(b)(2). An EA must include a discussion of alternatives and the environmental impacts of the action. 42 U.S.C. § 4332(2)(H).

38. NEPA requires agencies to take a hard look at the foreseeable impacts of a proposed action. *Kleppe v. Sierra Club*, 427 U.S. 390, 409-410 (1976).

39. The reasonableness of BLM's range of alternatives—including publicly recommended alternatives—is judged through the lens of the "rule of reason" standard:

> [t]he reasonableness of the alternatives considered is measured against two guideposts: First . . . an alternative is reasonable only if it falls within the agency's statutory mandate. Second, reasonableness is judged with reference to an agency's objectives for a particular project.

*N.M. ex. rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 709 (10th Cir. 2009) (citations omitted); *see also High Country Conserv. Advoc. v. U.S. Forest. Serv.*, 951 F.3d 1217, 1224 (10th Cir. 2020) (same).

**III. Federal Land Policy and Management Act**

40. FLPMA requires that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental. . . and archaeological values." 43 U.S.C. § 1701(a)(8).

41. To achieve these objectives, BLM "shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern ["ACEC"]." *Id.* § 1711(a). "This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values." *Id.*

42. This inventory information is used, *inter alia*, to prepare and maintain land use plans. *See id.* § 1712(a). Once finalized, BLM "shall manage the public lands . . . in accordance with the land use plans developed by" the agency." *Id.* § 1732(a); 43 C.F.R. § 1610.5-3(a) ("All future resource management authorizations and actions . . . shall conform to the approved plan"). "The statutory directive that BLM manage in accordance with land use plans, and the regulatory requirement that authorizations and actions conform to those plans, prevent BLM from taking actions inconsistent with the provisions of a land use plan." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004) (cleaned up).

43. In the present instance, BLM manages the Nine Mile Canyon region pursuant to the Price Field Office Resource Management Plan ("Price RMP") and Vernal Field Office Resource Management Plan ("Vernal RMP").[1] *See* Bureau of Land Mgmt., *Price Field Office,*

[1] In effect, Nine Mile Canyon is split down the middle between Duchesne County (on the north side) which is in the Vernal Field Office, and Carbon County (on the south side) which is in the Price Field Office. The two field offices have separate, but similar, management obligations for

*Record of Decision and Approved Resource Management Plan* (Oct. 2008) (last visited Oct. 5, 2026); Bureau of Land Mgmt., *Vernal Field Office, Record of Decision and Approved Resource Management Plan* (Oct. 2008) (last visited Oct. 5, 2026).




the Nine Mile Canyon region. Gate Canyon is on the north side of Nine Mile Canyon and thus in the Vernal Field Office.

44. There are at least two management decisions in the Vernal and Price RMPs that are relevant to this lawsuit. *First*, Nine Mile Canyon is a designated ACEC. *See* Price RMP at 136 (ACEC-10); Vernal RMP at 120 (ACEC-10). As noted above, "Nine Mile Canyon is known to contain the country's highest concentration of rock art panels, remnants of the prehistoric Archaic, Fremont, and Ute cultures." Price RMP at 136. As such, "[t]he area will be managed to enhance cultural and special status plant species while enhancing scenic vistas, recreation, and wildlife resource values." Vernal RMP at 120 (emphases added).

45. *Second*, due to its remarkable and unique setting, the Nine Mile Canyon region is managed in both the Price and Vernal RMPs to protect its visual resources (*i.e.*, scenic values). *See* Price RMP, Map R-5; Vernal RMP, Fig. 16a. Specifically, the Nine Mile Canyon region, including Gate Canyon, at issue in this lawsuit is designated as Visual Resource Management ("VRM") Class III. *See id.* Pursuant to this designation

> [t]he objective of Class III is to partially retain the existing character of the landscape. The level of change to the landscape should be moderate. Management activities may attract the attention of the casual observer, but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape.

Vernal RMP, App. I at *3.

46. To ensure its site-specific authorizations conform to the applicable VRM designations, BLM has established detailed step-by-step procedures for considering, analyzing and disclosing visual impacts. *See generally* Bureau of Land Mgmt., *Manual 8431 – Visual Resource Contrast Rating* (1986) (last visited Oct. 5, 2026). These step-by-step procedures are:

- Obtain project description;
- Identify VRM objectives;

- Select Key Observation Points ("KOP");
- Prepare visual simulations; and
- Complete the contrast rating.

*See generally id.* § II.

47. At step one, BLM reviews the relevant plan of development and other project-specific information because "[t]o effectively evaluate the visual impacts of a proposed action, a detailed project description is needed." *Id.* § II.A; *see also id.*, App. 1 – Project Description Guidelines (providing additional context to satisfy this step).

48. At step two, BLM reviews the relevant VRM designation in the applicable RMP(s). *See id.* § II.B.

49. At step three, BLM selects relevant KOPs in and near the project area. *See id.* § II.C. The KOPs are typically selected in "the most critical viewpoints" such as "along commonly traveled routes or at other likely observation points." *Id.*

50. At step four, relying on the KOPs, BLM prepares "[v]isual simulations" which are "an invaluable tool in effectively evaluating the impacts of a proposed project." *Id.* § III.D; *see also id.*, Illustration 1 – Example of Visual Simulation Technique. "Simulations are strongly recommended for potentially high impact projects" and are "extremely important to portray the relative scale and extent of a project." *Id.* § III.D. They "also help the public groups visualize and respond to development proposals, making public participation in the planning process more effective." *Id.*

51. At step five, BLM uses the information gathered during steps 1-4 to complete the agency's "Visual Contrast Rating Worksheet" (Form 8400-4). *Id.* § II.E; *see id.* at *8 (providing

an example of Form 8400-4).[2] The process of completing this worksheet involves several additional site- and project-specific steps and actions. *See generally id.* § III.

52. After completing steps 1-5, BLM has the information necessary to determine whether the proposed action conforms to the applicable RMP(s) VRM objectives. *See id.* § III.3. Among other things, this involves "compar[ing] the contrast rating [*i.e.*, the visual worksheet information] with the objectives for the approved VRM Class." *Id.* Importantly, "[i]n making these comparisons, [BLM] must also look at the cumulative effect of all the contrast ratings [from each selected KOP]" because "[c]ertain combinations of ratings may indicate there is a stronger overall contrast that the individual ratings show." *Id.*

**IV. National Historic Preservation Act**

53. The NHPA formally recognizes historic preservation as an important policy of the United States. Its opening passages declare that "(1) the spirit and direction of the Nation are founded upon and reflected in its historic heritage; (2) the historical and cultural foundations of the Nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American people; (3) the historic properties significant to the Nation's heritage are being lost or substantially altered, often inadvertently, with increasing frequency; (4) the preservation of this irreplaceable heritage is in the public interest so that its vital legacy of cultural, educational, aesthetic, inspirational, economic, and energy benefits will be maintained and enriched for future generations of Americans." National Historic Preservation Act § 1, Pub. L. No. 89-665 (Oct. 15, 1966), as amended by Pub. L. No. 96-515 (Dec. 12, 1980).

[2] The current version of Form 8400-4 is available at https://www.blm.gov/sites/default/files/policies/IB2019-012_att2.pdf (last visited Oct. 5, 2026).

54. The NHPA directs the Secretary of the Interior to establish and maintain a National Registry of Historic Places, which are historically significant "districts, sites, buildings, structures, and objects." 54 U.S.C. § 302101.

55. NHPA Section 106 seeks to protect America's heritage in part by requiring federal agencies to consider the effect of their "undertakings" on historic properties. *See* 54 U.S.C. § 306108; 36 C.F.R. pt. 800. An important part of this so-called "Section 106" review process is consultation with the appropriate State Historic Preservation Officer, Native American tribes, and other interested parties. The Section 106 process entails four basic steps.

56. *First*, the responsible agency must "determine whether the proposed Federal action is an undertaking . . . and, if so, whether it is the type of activity that has the potential to cause effects on historic properties." *Id.* § 800.3(a). An "undertaking" is any "project, activity, or program . . . requiring a Federal permit, license or approval." *Id.* § 800.16(y). A "historic property" is "any prehistoric or historic district, site, building, structure, or object included on, or determined eligible for inclusion on, the National Register [of Historic Places]" ("National Register") *Id.* § 800.16(l)(1); 54 U.S.C. § 300308.

57. *Second*, if the undertaking has the potential to affect historic properties, the agency must define the Area of Potential Effects ("APE") for the action. 36 C.F.R. § 800.4(a)(1). The NHPA regulations define the APE as:

> the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties . . . The area of potential effects is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking.

*Id.* § 800.16(d).

58. *Third*, the agency must make a "reasonable and good faith effort" to identify historic and cultural properties within the APE. *Id.* § 800.4(b)(1). This "may include background research, consultation, oral history interviews, sample field investigation, and field survey." *Id.* The agency must evaluate the National Register eligibility of all sites identified in the APE. *Id.* § 800.4(c). For sites not previously evaluated for National Register eligibility, the agency must "apply the National Register criteria" to determine whether they are potentially eligible for listing. *Id.* § 800.4(c)(1). "The passage of time, changing perceptions of significance, or incomplete prior evaluations may require the agency official to reevaluate properties previously determined eligible or ineligible." *Id.*

59. *Fourth*, if the agency finds that eligible properties are present in the APE, it must assess whether the proposed undertaking may cause adverse effects on the identified historic properties, in coordination with consulting parties. 36 C.F.R. §§ 800.4(d), 800.5.

60. The definition of "adverse effect" is broad. "An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." *Id.* § 800.5(a)(1) (emphasis added). Examples of adverse effects include the "[p]hysical destruction of or damage to all or part of the property," "[i]ntroduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features," and a "[c]hange of the character of the property's use or of physical features within the property's setting that contribute to its historic significance." *Id.* § 800.5(a)(2)(i), (iv), (v).

"Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." *Id.* § 800.5(a)(1).

61. The Section 106 process concludes with an agency determination of "adverse effect" or "no adverse effect." *See* § 800.5(d)(1).

62. If the agency reaches a "no adverse effect" finding, it must provide notice and documentation of such finding to all consulting parties. *Id.* § 800.5(c). Consulting parties may object to such a finding, which elevates the consultation process further. *Id.*

63. If the agency reaches an "adverse effect" finding, it must notify all consulting parties and invite their views to assess adverse effects. *Id.* §§ 800.5(d)(2); 800.6 If adverse effects cannot be resolved, the process is elevated again to the Advisory Council on Historic Preservation and the head of the agency undertaking the action. *Id.* § 800.7. Until this process is complete, the undertaking in question cannot go forward.

64. Agency officials must "ensure that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered." *Id.* § 800.1(c). They must also "ensure that a determination, finding, or agreement under the procedures in this subpart is supported by sufficient documentation to enable any reviewing parties to understand its basis." *Id.* § 800.11(a).

**V. Endangered Species Act**

65. Congress enacted the ESA to provide "a program for the conservation of…endangered species and threatened species." 16 U.S.C. § 1531(b). Thus, all federal agencies, including BLM, "shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of the [ESA]." *Id.* § 1531(c)(1).

66. The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which measures provided pursuant to [the ESA] are no longer necessary." *Id.* § 1532(3).

67. Under Section 7 of the ESA, BLM must consult with the FWS to "insure that any action authorized, funded, or carried out by [the] agency…is not likely to [1] jeopardize the continued existence of any endangered species or threatened species or [2] result in the destruction or adverse modification of [the critical habitat] for such species." *Id.* § 1536(a)(2).

68. "Action" is defined very broadly under the ESA. It refers to "all activities or programs of any kind authorized, funded or carried out…by Federal agencies in the United States" including, not limited to "actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02.

*69.* Likewise, "action area" is broadly defined to include "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *Id.*

70. For each federal action, BLM must follow an initial two-step process. *First*, BLM must request a species list from FWS to determine whether any listed species "may be present" in the action area. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c). "The ESA and its implementing regulations make clear that FWS is to make the critical 'may be present' determination, not the action agency." *All. for the Wild Rockies v. Grassman*, No. 9:21-cv-00105-DLC-KLD, 2022 U.S. Dist. LEXIS 243309, *81 (D. Mont. Sept. 30, 2022).

71. The "may be present" threshold is low and "does not require actual occurrence or occupancy." *Friends of the Clearwater v. Petrick*, 588 F. Supp. 3d 1071, 1088 (D. Idaho 2022)

(citations omitted). Rather "the plain text of the statute requires only the possibility that a listed species is present." *Id.* This determination must be "based on the best scientific and commercial data available." *Id.* at 1085.

72. *Second*, if any listed species may be present in the action area, BLM must prepare a "biological assessment" to determine whether the species may be affected by the proposed action. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c). "Without a biological assessment, it cannot be determined whether the proposed project will result in a violation of the ESA's substantive provisions." *Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir. 1985). The failure to prepare a biological assessment is a "substantial violation of the ESA." *Thomas v. Peterson*, 841 F.2d 332, 335 (9th Cir. 1988) (citing *Thomas*, 753 F.2d at 763).

73. The "may affect" threshold is similarly "very low." *Greater Hells Canyon Council v. Wilkes*, 790 F. Supp. 3d 1029, 1048 (D. Or. 2023); *see also Colo. Env't. Coal. v. Office of Legacy Mgmt.,* 819 F. Supp. 2d 1193, 1221-22 (D. Colo. 2011) ("This 'may affect' standard triggering the consultation requirement is low: 'Any possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement.") (cleaned up; citations omitted).

74. After completing the initial two-step process, if BLM determines that its proposed action may affect listed species, it must consult with FWS. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). If the action is likely to adversely affect a species, BLM must engage in "formal" consultation with FWS. 50 C.F.R. § 402.14(b)(1).

75. To complete formal consultation, FWS must provide BLM with a "biological opinion" explaining how the proposed action will affect the listed species. 16 U.S.C. § 1536(b);

50 C.F.R. § 402.14(g)(8) and (h). The biological opinion must outline "reasonable and prudent alternatives," if any, that could be taken by BLM to eliminate these harms. 16 U.S.C. § 1536(b)(3)(A).

76. BLM cannot proceed with an action that would likely jeopardize a listed species. *Id.* § 1536(a)(2).

77. Section 7(d) of the ESA prohibits BLM from making any "irreversible or irretrievable commitment of resources" prior to the conclusion of consultation which would have "the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." *Id.* § 1536(d).

## FACTUAL BACKGROUND

### I. Nine Mile Canyon and Gate Canyon Region

78. The Nine Mile Canyon region, including Gate Canyon, contains more than 10,000 unique, irreplaceable cultural, historical, and archaeological resources. Put simply, BLM has concluded that "[b]ecause of the vast cultural and historical resources throughout the canyon, the area [*i.e.*, entire Nine Mile Canyon region] is eligible for the [National Register]; many of the characteristics are historically significant at the national level." Price FEIS at 3-91.

79. This vast and expansive cultural history extends to Nine Mile Canyon's many side canyons and tributaries including Gate Canyon. "Cultural sites . . . are abundant within Gate Canyon." Jones & DeMille Eng., Gate Canyon Plan of Development, § 7.b.11 (Feb. 9, 2022) ("2022 POD").

80. The Nine Mile Canyon region also has "high scenic quality." Vernal FEIS at 3-34. In 2011, BLM prepared new visual resource inventories for the Price and Vernal Field Offices.

*See* Bureau of Land Mgmt., *Visual Resource Inventory, Price Field Office* (2011) ("Price VRI") (attached as Ex. 1); Bureau of Land Mgmt., *Visual Resource Inventory, Vernal Field Office* (2011) ("Vernal VRI") (attached as Ex. 2). BLM concluded that the visual resources in the Nine Mile Canyon region were more important and sensitive than previously disclosed in the 2008 Price and Vernal RMPs. For example, BLM explained that the Price Field Office is "[h]ome to some of the best recreational opportunities and cultural resource sites in the state" and thus the field office "relies heavily upon the scenery in the analysis area [*i.e.*, the field office boundary] and the preservation of that scenery to maintain the level of visitation that is desired." Price VRI at 3-1. "Therefore, lands within the analysis area that have the highest recreational usage and are the most notable for sightseeing, have the highest sensitivity levels. These include areas such as Nine Mile Canyon[.]" *Id.* at 3-1 to 3-2; Vernal VRI at 3-3, fig. 15 (Nine Mile Canyon region, including Gate Canyon, has the highest sensitivity level in the Vernal Field Office). As a result of the 2011 VRIs, BLM recognized the Nine Mile Canyon region, including Gate Canyon, would more appropriately be managed as VRM Class II, not Class III. *See* Price VRI at 5-3, fig. 18; Vernal VRI at 5-3, fig. 18.[3]

81. The Nine Mile Canyon region also is home to a broad range of wildlife and plants including sensitive, threatened, and endangered species. This includes the ESA-listed Owl and many other raptors such as ferruginous hawk, short-eared owl, prairie falcon, burrowing owl, and golden eagle. *See, e.g.*, 2015 EA at 10.

---

[3] The 2011 VRIs recommendations that the Nine Mile Canyon region be managed as VRM Class II did not alter the Class III designations in the Price and Vernal RMPs. However, it is new, relevant visual resource information that was in BLM's possession when it approved the Gate Canyon Project—yet BLM ignored that information in its NEPA analysis.

## II. Duchesne County's Prior Attempts to Pave Gate Canyon

82. BLM previously considered prior versions of this same project in 2015 and 2023.

83. Duchesne County first proposed this project in 2015. BLM prepared a draft EA for the project, but never issued a final EA. *See generally* 2015 EA. There, BLM explained that the purpose, and intended result, of the proposed road improvements through Gate Canyon was to facilitate oil and gas development in the Uinta Basin and to open the road to "high volumes of heavy truck traffic (700 to 1,000 vehicles per day, with about 50 percent being heavy trucks) for several years as resource fields are developed." 2015 EA at 5.

84. At that time, BLM considered three potential alternatives: (1) the proposed route which included, *inter alia*, the blasting of cliffs and removal of rock and other natural features to significantly alter (straighten) the road alignment to facilitate the heavy truck traffic (Alternative A); (2) update/pave the road while following its existing alignment (Alternative B); and (3) deny the right-of-way amendment (no action alternative). *See* 2015 EA at 4-7; *id.*, App. A, Fig. 1 (map showing the Alternative A route through the cliff walls and rock formations and the route compared to the existing road alignment).


Area of Detail
UTAH
Five Mile Draw Road
Pipeline Road
Project End
Wells Draw Road
Wrinkle Road
Rye Patch Road
T11S R15E
Project Begin
Nine Mile Canyon Road
N
Feet
0 1,500 3,000
Proposed Road Centerline
Alternative B (Existing Road) Centerline
Local Roads
Land Ownership
BLM
State Trust Lands
Private
Jones & DeMille Engineering
- infrastructure professionals -
800.748.5275 www.jonesanddemille.com
Duchesne County SSD #2
Wells Draw Road (Gate Canyon)
Project Overview
DUCHESNE COUNTY
SCALE: 1" = 3,000'
1

85. The 2015 EA identified and disclosed some of the environmental and cultural resources at risk. Regarding cultural resources, BLM explained that in Gate Canyon alone "[t]here are 47 historic sites within the project area; 43 of these sites are considered eligible to the National Register of Historic Places." 2015 EA at 9. At least 11 of these sites were within 10 feet of the proposed action. *See id.* at 11-12. BLM concluded that "[c]onstruction near these sites could . . . result in alteration of setting and integrity." *Id.* at 11. Additionally, "[i]ndirect impacts could include damage or destruction of cultural resources as a result of increased visitation of otherwise remote areas." *Id.* Thus, "it was determined that it would be necessary to mitigate the adverse effects to the historic properties that would result from the proposed undertaking." *Id.*

86. For migratory birds including raptors, BLM identified many species present in or near the project area including the Owl—a threatened species listed under the ESA. *See* 2015 EA at 10. Specifically, "[t]he proposed project area is located within one-half mile of fair and good [Owl] habitat units." *Id.* "These units are based on modelling, and were ground-truthed, assessed, and categorized for probability of representing suitable nesting habitat. Approximately 1.1 miles of the existing roadway are within one-half mile of a fair habitat unit, and 0.7 miles of the existing roadway are within one-half mile of a good habitat unit." *Id.*

87. At that time, BLM concluded that the project "may affect" the Owl. Specifically, "noise from construction activities, including blasting, could disturb owls if they were within one-half mile of the project area." 2015 EA at 14. Thus, "[d]ue to the proximity of potentially suitable habitat units, implementation of the proposed action may affect, but would not likely adversely affect the [Owl]." *Id.*

88. BLM never finalized the 2015 EA.

89. In 2023, BLM solicited scoping comments for the same reproposed road improvement project. *See* Bureau of Land Mgmt., *BLM seeks public comment on right-of-way amendment in Duchesne County* (Jan. 9, 2023) (last visited Oct. 5, 2026). As part of that process, BLM prepared a scoping report in which it identified resource values that the agency determined warranted further analysis including, but not limited to: cultural/archaeological, the Nine Mile Canyon ACEC, and wildlife/migratory birds and raptors. *See* Bureau of Land Mgmt., *Public Scoping – Wells Draw Road Amendment: Gate Canyon* (Jan. 9, 2023) (last visited Oct. 5, 2026).[4]

90. Duchesne County's third-party contractor also prepared and submitted a plan of development for the project. *See generally* 2022 POD. Among other things, the plan recognized that:

- "Roosting habitat for bats may be impacted by blasting and cutting through canyon walls. Nesting birds, particularly raptors with cliff nests, may be disturbed by project activities."
- "[Owl] habitat occurs within one-half mile of the project area."
- "Cultural sites . . . are abundant within Gate Canyon. Most of these sites are axle grease inscriptions. The proposed project would largely avoid impacts to these sites; however, a few would be destroyed."
- "Large cuts through the canyon would be necessary to improve roadway geometry; these cuts would impact the visual setting of the road."

*Id.* §§ 7.b.9-12.

91. The 2023 proposal also included detailed drawings and other information including a "blasting plan" for the destruction and removal of cliff walls and other large rock

[4] Select "Documents" and then "Scoping Document Wells Draw Road Amendment.docx".

features to straighten the road alignment. *See id.*, Att. C (Plan and Profile Sheets); *id.*, Att. D (Blasting Plan).

92. SUWA submitted scoping comments and raised a broad range of concerns and issues for BLM's consideration, including the issues raised in this litigation. *See generally* S. Utah Wilderness All., *RE: Scoping Comments on the Wells Draw Road Amendment: Gate Canyon Project, DOI-BLM-UT-G010-2023-0026-EA* (Feb. 8, 2023) ("2023 SUWA Scoping Comments").

93. The 2023 proposal garnered significant attention from the media and opposition from the public due to its potential impacts to significant cultural resources. *See e.g.*, Brian Maffly, *Duchesne County looks to open oil tanker route through Nine Mile, Utah's famed rock art corridor*, Salt Lake Tribune (Jan. 14, 2023) (last visited Oct. 5, 2026); Brian Maffly, *Rock art site Nine Mile Canyon could become 'hydrocarbon highway' under Utah bill*, Salt Lake Tribune (Feb. 23, 2022) (last visited Oct. 5, 2026); Benjamin Sutton, *Preservationists raise alarm over plan to widen road through petroglyph-filled canyon in Utah used by oil tankers*, The Art Newspaper (Jan. 31, 2023) (last visited Oct. 5, 2026).

94. Duchesne County subsequently abandoned the project and no new NEPA document was prepared.

**III. The 2026 Gate Canyon Project**

95. BLM did not allow the public to participate in the agency's review and consideration of the 2026 Gate Canyon Project. Rather, BLM approved the project one month after having posted only minimal information about the project (only a generic "location and description of the proposed action") to its public ePlanning website. Bureau of Land Mgmt.,

Wells Draw Road Amendment – Gate Canyon, DOI-BLM-UT-G010-2026-0076-EA, at 22 (April 2026) ("2026 EA"). BLM never posted a draft NEPA document, the 2026 plan of development, or—besides a single, high-level map—any supporting information to a public site.

96. Within days of the March 16 posting, SUWA, the Center, and the Coalition each separately requested a comment period and opportunity to participate in the NEPA process. BLM either did not respond to or denied those requests. *See* 2026 EA at 22. The Coalition also requested to be a consulting party pursuant to the NHPA and its implementing regulations. BLM denied that request too. *See id.*

97. Nonetheless, based on the sole, generic map posted to ePlanning, and SUWA's prior knowledge of, and involvement with, the 2015 and 2023 project proposals and the Nine Mile Canyon region, SUWA and the Center sent BLM a detailed comment letter setting forth the numerous resource and legal issues that BLM should consider. *See generally* S. Utah Wilderness All. et al., *RE: Wells Draw Road Amendment – Gate Canyon, DOI-BLM-UT-G010-2026-0076-EA* (April 17, 2026) ("2026 SUWA Comments"). The Coalition provided comments on April 22, 2026, highlighting the cultural significance of the Nine Mile Canyon region including Gate Canyon. *See* Nine Mile Canyon Coal., *RE: Wells Draw Road Amendment – Gate Canyon, DOI-BLM-UT-G010-2026-0076-EA* (April 22, 2026).

98. Less than one week later, BLM issued a typo-laden EA and signed the decision record ("DR") for the Gate Canyon Project. *See* Bureau of Land Mgmt., *Decision Record for Wells Draw Road Amendment – Gate Canyon*, DOI-BLM-UT-G010-2026-0076-EA (April 2026) (last visited Oct. 5, 2026).[5] At that time, BLM posted—for the first time—the final 2026 EA,

[5] Select "2026-0076-DR.pdf".

DR, Finding of No Significant Impact ("FONSI"), and a partial 2026 plan of development. *See* Bureau of Land Mgmt., *Finding of No Significant Impact for Wells Draw Road Amendment – Gate Canyon*, DOI-BLM-UT-G010-2026-0076-EA (April 2026) (last visited Oct. 5, 2026).[6] Jones & DeMille Eng., *Amendment to UTU-81573 Gate Canyon Road Reconstruction, Plan of Development* (April 13, 2026) (last visited Oct. 5, 2026).[7] BLM did not respond to or address Plaintiffs' comments. Instead, BLM stated only, "[a]ll remarks were read and considered." 2026 EA at 22.

99. The following photographs show a portion of the cliff walls and large rock features in Gate Canyon that will be blasted and destroyed to make way for the new road alignment.



*Photo 3: Wells Draw Road in Gate Canyon*

[6] Select "2026-0076-FONSI.pdf".
[7] Select "EA Appendix B – Plan of Development.pdf".



*Photo 4: Wells Draw Road in Gate Canyon*

100. The 2026 EA did not consider a reasonable range of alternatives, failed to analyze and disclose the foreseeable impacts to cultural, historical, archaeological, visual resources, the Nine Mile Canyon ACEC, threatened or endangered species including Owl, and traffic. Additionally, the Gate Canyon Project decision is not in accordance with the Price and Vernal RMPs. Finally, BLM arbitrarily determined the Project would not adversely affect the hundreds of cultural and archaeological resources in the Nine Mile Canyon region.

**A. Alternatives**

101. In the present instance, BLM established an expansive purpose and need for the 2026 EA:

> The need for BLM action is its responsibility under [FLPMA] to respond to [the county's] application to amend their existing right-of-way (UTU-81573) to realign the Gate Canyon portion of the Wells Draw road. The BLM's purpose is to minimize impacts to, and prevent unnecessary or undue degradation of, sensitive resources on BLM-administered land.

2026 EA at 4.

102. Despite these broad objectives, the 2026 EA analyzed and disclosed just two alternatives on the extreme ends of the spectrum: (1) approving the blasting and removal of cliffs and significant road realignment exactly as proposed by the county; and (2) rejecting the project. *See* 2026 EA at 5-11.

103. BLM rejected an alternative that would utilize the existing road alignment in Gate Canyon as unviable—even though that exact alternative was considered in detail in the 2015 EA (Alternative B) and considered by the agency to be a viable option at that time. Moreover, BLM never responded to or addressed the alternatives recommended by SUWA in comments on various iterations of the proposal.

104. SUWA's recommended alternatives included:

- The Nine Mile Canyon ACEC Alternative;
- A Delayed Approval Alternative; and
- A Public Safety Alternative.

*See generally* 2023 SUWA Scoping Comments at 3-4 (detailing each alternative). BLM never disputed that SUWA's alternatives were reasonable.

105. Additionally, BLM's narrow range of extreme alternatives is not in accordance with the Vernal RMP. Specifically, the RMP states:

> Alternatives, including denial of the proposal, should be identified, considered and analyzed in a NEPA document anytime an action is proposed within the spatial buffer zone of a raptor nest. <u>Selection of a viable alternative that avoids an impact to nesting raptors should be selected over attempting to mitigate those impacts</u>.

Vernal RMP, App. A at A-5 (emphasis added).

106. Here, there are raptor nests in and near the Gate Canyon Project area. *See* 2026 EA at 16-17. However, rather than consider an alternative that avoids impacts to nesting raptors, BLM instead selected the action alternative which, at most, attempts to mitigate those impacts.

**B. Cultural, Historical, and Archaeological Resources**

107. The EA does not even identify historical and archaeological resources, let alone analyze and disclose the foreseeable impacts, including harm from road construction in Gate Canyon, increased traffic through Gate and Nine Mile canyons, and the resulting noise, dust, and air pollution. *See generally* 2026 EA.

108. As noted above, in 2015, BLM concluded that in Gate Canyon alone there are forty-seven historic sites, forty-three of which are eligible to the National Register. *See* 2015 EA at 9. Eleven of the sites are within ten feet of the existing road. *Id.* at 11-12. At that time, BLM recognized that the road realignment—the same proposal BLM approved here—could "directly and irreversibl[y] damage or destroy sensitive cultural resources." *Id.* at 11.

109. Similarly, the 2022 POD stated that Gate Canyon has "abundant" cultural sites and concluded that because of the road realignment "a few [of these sites] would be destroyed." 2022 POD § 7.b.11.

110. The 2026 EA ignored this information and arbitrarily changed its prior position concerning impacts without explanation or basis.

111. BLM also failed to comply with its NHPA Section 106 obligations. Among other shortcomings, BLM arbitrarily defined the APE. *See* 36 C.F.R. § 800.4. As a result, BLM failed to make "a reasonable and good faith effort" to identify historic and cultural properties within the APE. *See* 43 C.F.R. § 800.4(b)(1). For example, BLM didn't identify or acknowledge, let alone

identify, the hundreds of sites in Nine Mile Canyon. And BLM arbitrarily concluded that the proposed undertaking would have no adverse effects on the identified historic properties, even though the county's third-party contractor had previously acknowledged that "a few [cultural sites] would be destroyed." 2022 POD § 7.b.11.

112. BLM also denied the Coalition's request to participate as consulting parties and ignored the comments the Coalition submitted regarding known and identified cultural and historical resources.

**C. The Nine Mile Canyon ACEC**

113. For the Nine Mile Canyon ACEC, BLM never answered the question it posed to purportedly frame its analysis of the Gate Canyon Project's impacts on the ACEC: "[h]ow would the Wells Draw Road Realignment affect relevance [sic] and importance [sic] characteristics of the Nine Mile Draw [sic] [ACEC]?" 2026 EA at 12. However, despite raising the question, BLM never answers it.

114. The Nine Mile Canyon ACEC contains relevant and important cultural, special status plant species, scenic, recreation, and wildlife resource values. *See* Price RMP at 136; Vernal RMP at 120; *see also* Price FEIS at 3-91 (describing these values); Vernal FEIS at 3-88, tbl. 3.16.1 (same). However, to answer its question, BLM limited its analysis in the EA to considering the foreseeable "scenic" impacts. *See* 2026 EA at 13 ("The impact indicator is the acreage of scenery changed by the alternatives."). At no time does BLM analyze and disclose the foreseeable impacts to the other relevant and important ACEC values.

115. Moreover, an additional relevant question—never asked, nor answered by the agency—is whether the Gate Canyon Project conforms to the Price and Vernal RMP's provisions regarding the Nine Mile Canyon ACEC.

116. Pursuant to the Price and Vernal RMPs and FLPMA, BLM is required to manage the ACEC to "enhance" the identified relevant and important values. *See, e.g.*, Vernal RMP at 120; Price RMP at 136-137. The EA never identified all ACEC values, let alone explained how authorizing the blowing up of cliffs and significant realigning, widening, and paving of the Gate Canyon Road—a road that passes within ten feet of known cultural sites—in an effort to increase traffic through the canyon "enhances" the ACEC's values. *See* 2026 EA at 13 (providing one paragraph of "analysis" that is focused solely on foreseeable impacts to scenic values).

**D. Visual Resources**

117. For visual resources, BLM made a new set of mistakes. There, BLM did not follow the step-by-step procedures established in Manual 8431 specifically designed to help the agency analyze and disclose foreseeable visual impacts of proposed actions. As such, BLM has no data or information to support its conclusions. Additionally, BLM asked and answered the wrong questions so, to the extent the EA contains any visual resource analysis, that analysis is misdirected and unhelpful.

118. BLM's analysis was formed by the following question: "[h]ow would the Wells Draw Road realignment affect visual resources in the Nine Mile Canyon Special Recreation Management Area ["SRMA"]?" 2026 EA at 19. It is never explained why the SRMA—which applies solely to <u>recreation</u>, not visual resources—was chosen or appropriate. *See, e.g.*, Vernal RMP at 106, 110 (SRMA-5). This is just the first of many errors.

119. Next, in the EA, BLM defines the "impact indicator" as the "degree of visual contrast introduced by the alternatives." 2026 EA at 19. This is a reasonable enough starting point because BLM has established detailed procedures and guidance for doing just that (*i.e.*, Manual 8431); however, the agency failed to follow those procedures. At best, BLM complied with the first two steps of Manual 8431: BLM obtained the project description and identified the VRM objectives. *See* Manual 8431 §§ II.A, II.B; *see also* 2026 EA, App. B (2026 POD); 2016 EA at 19 (describing the VRM Class III management prescriptions). But BLM did not follow the remaining three steps:

- Select KOPs;
- Prepare visual simulations; and
- Complete the contrast rating.

*See* Manual 8431 §§ II.C, II.D, II.E; *see also* 2026 EA (never taking these steps). Nor did BLM provide an explanation, let alone a reasoned one, for why it chose to depart from its guidance.

120. Instead, the grand total of BLM's visual contrast "analysis" is set forth in three conclusory sentences:

> During construction, the roadway widening, surface upgrades, and installation of drainage features are expected to attract attention, especially in the short-term during the time of the construction. However, the disturbances would be directly adjacent to the existing road alignment, which would prevent them from dominating the view beyond the existing road. These changes would be consistent with VRM Class III objectives.

2026 EA at 19.

121. This is not a visual contrast rating analysis and is unsupported by record evidence. At no time does BLM explain how the destruction and removal of entire cliff walls and other large rock features will impact users' experience in and surrounding Gate Canyon.

122. Finally, the EA lacks any supporting record evidence for the conclusory statement that "[t]hese changes would be consistent with VRM Class III objectives." 2026 EA at 19. As noted above, the Class III objectives require BLM "to partially retain the existing character of the landscape." Vernal RMP, App. I at *3. That is, "[t]he level of change to the landscape should be moderate . . . Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape." *Id.*

123. BLM does not explain how the obliteration of cliff walls and other prominent rock features and the paving, widening, and straightening of the Gate Canyon Road "repeat[s] the basic elements found in the predominant natural features of the characteristic landscape." Critically, assuming that such activities could satisfy this standard, BLM had the tools and procedures to make that determination but ignored them.

124. BLM did not perform the procedures for visual impacts analysis needed to support its findings here. Instead, despite having none of the necessary information, the EA concludes that "[t]hese changes would be consistent with VRM Class III objectives." As such, BLM has "failed to consider an important aspect of the problem" and "offered an explanation…that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. BLM's visual resources analysis is arbitrary and capricious.

**E. Mexican Spotted Owls**

125. Unlike the 2015 EA, which determined "[t]he proposed project area is located within one-half mile of fair and good" Owl habitat, and "noise from construction activities, including blasting, could disturb owls if they were within one-half mile of the project area." 2015 EA at 10, 14, the 2026 EA does not analyze effects on the Owl at all.

126. BLM's rationale for not including analyzing impacts to the Owl in detail was simply that a 2022 habitat assessment and occupancy surveys from 2017 and 2022 did not find suitable habitat or individuals within a half mile of the project area.[8] 2026 EA, App. A at vi.

127. On information and belief, BLM did not conduct a habitat assessment or occupancy survey for the Owl in 2026.

128. Regarding its ESA consultation obligations, BLM stated it did not consult with FWS because "[t]here were no [threatened and endangered] issues identified." 2026 EA at 23.

129. Notably, however, nowhere in the EA does BLM determine that the Gate Canyon Project will have "no effect" on the Owl for the purposes of Section 7 consultation.

130. On information and belief, BLM did not 1) ask FWS for a current list of species that may be present in the action area; or 2) prepare a biological assessment prior to finalizing the 2026 EA and approving the Gate Canyon Project.

**F. Traffic**

131. Together, Wells Draw and Nine Mile Canyon Roads serve as a transportation route connecting Duchesne and Carbon counties. As Duchesne County acknowledges, accommodating an increase in traffic between the two counties is a primary purpose for the Gate Canyon Project.

132. Regarding the foreseeable impacts of traffic through Gate Canyon, BLM defined the "impact indicator" as the "annual average daily traffic." 2026 EA at 19. In January 2025, the project applicant installed traffic counters at the top and bottom of Gate Canyon. *Id.* at 20. The

[8] The 2026 EA does not define the "project area" so it is unclear where the surveys were conducted or whether they covered the entire action area for the Gate Canyon Project. *See* 50 C.F.R. § 402.02 (definition of "action area").

counters were left in place for one week. *Id.* The traffic averaged fifty-eight vehicles per day, with thirty-four percent (twenty vehicles) being trucks. *Id.* BLM then compared this new information to several other traffic studies prepared for the Nine Mile Canyon region and estimated that "current Gate Canyon traffic is between 50 to 600 vehicles per day." *Id.* at 20.

133. However, despite the purpose of the proposed action being to facilitate access through the canyon, BLM concluded that "[n]o changes would occur in Nine Mile Canyon to attract more visitors, so no meaningful change to traffic patterns in Nine Mile Canyon are anticipated from the proposed Gate Canyon Road realignment." *Id.* at 21.

134. BLM also concluded that oil tanker traffic would not increase through Gate Canyon and that the agency "cannot quantify how oil tankers [sic] trucks may use Gate Canyon to move oil from oil fields in Myton and beyond to loadouts in Wellington because those contracts are private information between the oil companies and the trucking companies and outside of BLM's jurisdiction." *Id.*

135. All of BLM's assumptions are undermined and contradicted by the agency's prior information and analysis regarding this same project. For example, the 2015 EA concluded that, if the road project were approved, "[t]raffic on this road is expected to include relatively high volumes of heavy truck traffic (700 to 1,000 vehicles per day, with about 50 percent being heavy trucks) for several years as resource [*i.e.*, oil and gas] fields are developed. The road would provide year-round, all-weather access to the region." 2015 EA at 5. These same estimates were repeated in the county's third-party prepared plan of development provided to BLM in 2022. *See* 2022 POD § 1.g ("Traffic is expected to include passenger vehicles and truck traffic. Traffic

volume is expected to be approximately 700 to 1,000 vehicles per day with up to 50% truck traffic.”).

136. This information was widely reported in the news. *See, e.g.*, Brian Maffly, *Duchesne County looks to open oil tanker route through Nine Mile, Utah's famed rock art corridor*, Salt Lake Trib. (Jan. 14, 2023) (“the upgraded road is expected to draw up to 1,000 vehicles a day, half of them trucks, according to the [2022 POD]”), https://www.sltrib.com/news/environment/2023/01/14/duchesne-county-looks-open-oil/; Brian Maffly, *Rock art site Nine Mile Canyon could become ‘hydrocarbon highway’ under Utah bill*, Salt Lake Trib. (Feb, 23, 2023) (reporting that the Gate Canyon Project would open the route to “[a] tanker truck every 7 minutes.”), https://www.sltrib.com/news/environment/2022/02/23/rock-art-site-nine-mile/; Kevin T. Jones, *Proposed tanker route threatens priceless artworks in Utah's Nine Mile Canyon*, Salt Lake Trib. (March 17, 2023) (“A proposed road improvement will bring oil tankers at a rate of one every three minutes through the canyon, along with local and tourist traffic.”), https://www.sltrib.com/opinion/commentary/2023/03/17/kevin-t-jones-proposed-tanker/.

137. The 2026 EA does not address or respond to any of this information—all of which has been in BLM's possession for years—nor does it analyze and disclose the foreseeable impacts of approving a road upgrade that will increase daily vehicle traffic from 50-600 vehicles to 700-1,000 vehicles (half of which will be large oil tankers). The 2026 EA ignored this information and changed its prior position concerning impacts without explanation or basis.

**FIRST CAUSE OF ACTION**
**Violation of NEPA and APA**

138. Plaintiffs reallege and incorporate all paragraphs above.

139. Federal agencies must comply with NEPA before there are "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(v).

140. NEPA requires that federal agencies "to the fullest extent possible" study, analyze and disclose, among other things:

- The "reasonably foreseeable environmental effects of the proposed action;" and
- "[A]ny reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented."

*Id.* § 4332(2)(C)(i)-(iii).

141. Federal Defendants' decision to approve the Gate Canyon Project is an irreversible and irretrievable commitment of resources.

142. BLM violated NEPA by failing to analyze and disclose the foreseeable impacts of the Gate Canyon Project on a host of resources including, but not limited to cultural, historical, archaeological resources; visual and scenic resources; traffic; listed species under the ESA, including the Owl; and the Nine Mile Canyon ACEC.

143. BLM also violated NEPA and failed to take a hard look at the aforementioned resources because the agency arbitrarily ignored evidence and contradictory prior analysis of the nearly identical proposal without explaining why the prior evidence and analysis was no longer applicable.

144. Accordingly, the 2026 EA, DR, and FONSI, are arbitrary, capricious, and not in accordance with NEPA, and therefore must be set aside under the APA. 5 U.S.C. § 706(2)(A).

**SECOND CAUSE OF ACTION**
**Violation of NEPA and the APA**

145. Plaintiffs reallege and incorporate all paragraphs above.

146. NEPA requires that federal agencies "to the fullest extent possible" study, analyze and disclose, among other things, "a reasonable range of alternatives to the proposed agency action . . . that are technically and economically feasible, and meet the purpose and need of the proposal." *Id.* § 4332(2)(H) (the agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources").

147. A "reasonable range of alternatives" includes "all reasonable alternatives to the proposed action," *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1166 (10th Cir. 2002), including alternatives that are "significantly distinguishable from the alternatives already considered." *Richardson*, 565 F.3d at 708-09.

148. Consideration of just two "polar opposite" alternatives does not constitute a "reasonable range of alternatives." *Rocky Mtn. Wild v. Bernhardt*, 506 F. Supp. 3d 1169, 1185 (D. Utah 2020).

149. The 2026 EA considered only two alternatives: the proposed action and the NEPA-mandated "no action" alternative, despite being aware of other reasonable middle-ground alternatives.

150. BLM violated NEPA by failing to analyze and disclose a reasonable range of alternatives including those recommended by SUWA;

151. BLM also violated NEPA and the APA by failing to explain why it changed its prior position in the 2015 EA that a middle-ground alternative preserving the existing road alignment, Alternative B, was a reasonable alternative to the proposed action.

152. Accordingly, the 2026 EA, DR, and FONSI, are arbitrary, capricious, and not in accordance with NEPA, and therefore must be set aside under the APA. 5 U.S.C. § 706(2)(A).

**THIRD CAUSE OF ACTION**
**Violation of FLPMA and the APA**

153. Plaintiffs reallege and incorporate all paragraphs above.

154. FLPMA requires that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental . . . and archaeological values." 43 U.S.C. § 1701(a)(8).

155. BLM prepares land use plans (i.e., RMPs) to accomplish these objectives. Once finalized, BLM "shall manage the public lands . . . in accordance with the land use plans developed by" the agency." *Id.* § 1732(a); 43 C.F.R. § 1610.5-3(a) ("All future resource management authorizations and actions . . . shall conform to the approved plan"). "The statutory directive that BLM manage in accordance with land use plans, and the regulatory requirement that authorizations and actions conform to those plans, prevent BLM from taking actions inconsistent with the provisions of a land use plan." *Norton*, 542 U.S. at 69 (citation modified).

156. The Gate Canyon Project decision is not in accordance with the Price and Vernal RMPs. Specifically:

- The Vernal RMP requires that when a proposed action is "within the spatial buffer zone of a raptor nest," BLM's "[s]election of a viable alternative that avoids in impact to nesting raptors should be selected over attempting to mitigate those impacts." Vernal RMP, App. A at A-5.

- The Vernal RMP requires BLM to manage the Nine Mile Canyon ACEC in a manner that "enhance[s] cultural and special status plant species while enhancing scenic vistas, recreation, and wildlife resource values." Vernal RMP at 120 (emphases added).

- The Vernal RMP requires BLM to manage Gate Canyon and the surrounding Nine Mile Canyon area subject to VRM Class III. *See* Vernal RMP, Fig. 16a. To determine whether any proposed action conforms to the respective RMP VRM class designation, BLM's VRM Manual requires the agency to complete five steps:

  - Obtain project description;
  - Identify VRM objectives;
  - Select KOPs;
  - Prepare visual simulations; and
  - Complete the contrast rating.

  Manual 8431 § II.

  BLM did not start, let alone complete steps 3-5. It therefore lacks the necessary information to ensure the Gate Canyon Project conforms to the Vernal RMP VRM Class III designation. Nor did BLM provide a reasoned, nor any, explanation for departing from the Manual's provisions.

157. Accordingly, the 2026 EA, DR, and FONSI are arbitrary, capricious, an abuse of discretion, and not in accordance with law or required procedure under FLPMA and its implementing regulations and must be set aside under the APA. 5 U.S.C. § 706(2)(A).

## **FOURTH CAUSE OF ACTION**
## **Violation of the NHPA and the APA**

158. Plaintiffs reallege and incorporate all paragraphs above.

159. The Gate Canyon Project constitutes an undertaking under the NHPA. *See* 36 C.F.R. § 800.16(y) ("undertaking" is defined as any "project, activity, or program . . . requiring a Federal permit, license or approval."). As such, BLM was required to complete four Section 106 procedural steps prior to approving the project:

- "[D]etermine whether the proposed Federal action . . . is the type of activity that has the potential to cause effects on historic properties[;]"

- Define the APE for the action;

- Make a "reasonable and good faith effort" to identify historic and cultural properties within the APE; and

- Assess whether the proposed undertaking may cause adverse effects on the identified historic properties, in coordination with consulting parties.

36 C.F.R. §§ 800.3(a), 800.4(a)(1), 800.4(b)(1), 800.4(d), 800.5.

160. BLM arbitrarily defined the APE and thus did not make a reasonable and good faith effort to identify historic and cultural properties. BLM also arbitrarily concluded that the undertaking would have no adverse effect on historic properties.

161. Accordingly, the 2026 EA, DR, and FONSI, are arbitrary, capricious, an abuse of discretion, and not in accordance with law or required procedure under the NHPA and its implementing regulations and must be set aside under the APA. 5 U.S.C. § 706(2)(A), (D).

**FIFTH CAUSE OF ACTION**
**Violation of the ESA**

162. Plaintiffs reallege and incorporate all paragraphs above.

163. For each proposed federal action, BLM "shall . . . request of the [FWS] information whether any species which is listed . . . may be present in the area of [the] proposed action." 16 U.S.C. § 1536(c)(1); *see also* 50 C.F.R. § 402.12(c) (BLM "shall convey to [the FWS] . . . a written request for a list of any listed . . . species . . . that may be present in the action area").

164. The Gate Canyon Project is a federal action under the ESA.

165. The action area for the Gate Canyon Project includes both BLM-managed land and land owned by the Utah Trust Lands Administration. *See* 50 C.F.R. § 402.02 ("action area" is broadly defined under the ESA as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action.").

166. BLM failed to request a species list from FWS to determine whether any listed species, including the Owl, "may be present" in the action area.

167. If any listed species may be present in the action area, BLM "shall conduct a biological assessment for the purposes of identifying any . . . threatened species which is likely to be affected by such action." 16 U.S.C. § 1536(c)(1); *see also* 50 C.F.R. § 402.12(c) (BLM "shall convey to [the FWS] . . . a written notification of the species . . . that are being included in the biological assessment.").

168. The Owl may be present in the action area, as explained above. Nonetheless, BLM failed to 1) prepare a biological assessment for the species, and 2) provide the biological assessment to the FWS.

169. BLM "shall, in consultation with . . . the [FWS], insure that any action . . . is not likely to jeopardize the continued existence of any . . . threatened species." 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.14(a) (BLM "shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required.").

170. The Gate Canyon Project may affect the Owl, as explained above. Nonetheless, BLM failed to consult with FWS regarding impacts to the species.

171. BLM's failure to take these required procedural steps and actions prior to approving the Gate Canyon Project violated the ESA and its implementing regulations. 16 U.S.C. §§ 1536(a)(2), 1536(c)(1); 50 C.F.R. §§ 402.12(c), 402.14(a); and/or the APA, 5 U.S.C. §§ 701-706.

**SIXTH CAUSE OF ACTION**
**Violation of the ESA**

172. Plaintiffs reallege and incorporate all paragraphs above.

173. The ESA prohibits BLM from making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measure which would not violate [Section 7(a)(2) of the ESA]." 16 U.S.C. § 1536(d).

174. This prohibition applies prior to the beginning of Section 7(a)(2) consultation. *Nat. Res. Def. Council v. Houston*, 146 F.3d 1118, 1128 n.6 (9th Cir. 1998), and applies to both government agencies and private parties (*e.g.*, oil and gas lessees). *See Envtl. Prot. Info. Ctr., Inc. v. Pac. Lumber Co.*, 67 F. Supp. 2d 1090, 1104 (N.D. Cal. 1999).

175. Approving a right-of-way for a road improvement project is an irretrievable commitment of resources and thus triggers BLM's obligations under the ESA.

176. Because BLM approved the Gate Canyon Project before conducting any site-specific Section 7 consultation for the Owl, it has violated the ESA Section 7(d). 16 U.S.C. § 1536(d); and/or the APA, 5 U.S.C. §§ 701-706.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A. Declare that Defendants have violated NEPA and the APA by approving the Gate Canyon Project;

B. Declare that Defendants have violated FLPMA, its implementing regulations, and the APA by approving the Gate Canyon Project;

C. Declare that Defendants have violated the NHPA, its implementing regulations, and the APA by approving the Gate Canyon Project;

D. Declare that Defendants have violated the ESA, its implementing regulations, and/or the APA by approving the Gate Canyon Project;

E. Declare unlawful, set aside, and vacate the Gate Canyon Project's 2026 EA, FONSI, and DR;

F. Enjoin Defendants from taking any actions pursuant to the 2026 EA, FONSI, and/or DR until they have complied with NEPA, FLPMA and its implementing regulations, the NHPA and its implementing regulations, the ESA and its implementing regulations, and the APA;

G. Retain continuing jurisdiction of this matter until Defendants fully remedy the violations of law complained of herein;

H. Award Plaintiffs the costs they have incurred in pursuing this action, including attorneys' fees, as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other applicable provisions; and

I. Grant other such relief the Court deems just and proper.

Respectfully submitted October 6, 2026

*<u>/s/ Hanna Larsen</u>*
Landon Newell
Hanna Larsen
SOUTHERN UTAH WILDERNESS ALLIANCE

*Attorneys for Plaintiffs*
*Nine Mile Canyon Coalition and*
*Southern Utah Wilderness Alliance*

Edward B. Zukoski (*pro hac vice pending*)
Wendy Park (*pro hac vice pending*)
CENTER FOR BIOLOGICAL DIVERSITY

Oliver Wood
OLIVER WOOD LAW, PLLC

*Attorneys for Plaintiff*
*Center for Biological Diversity*